This case this morning is number 13-1407, In Re Roslin Institute. Mr. Eureka, am I pronouncing that correctly? Eureka. May it please the Court. Good morning, Your Honors. I'm Salvatore Eureka and this is my partner, Scott Lee, representing Roslin. There are two issues on appeal in this case. The first issue is whether a clone of a mammal fulfills the natural phenomenon exception to patentable subject matter. In other words, is Dolly a natural phenomenon? Mr. Eureka, in the red brief, it says Roslin's emphasis on phenotypic characteristics cannot be reconciled with the position one would expect it to take in enforcing its patent rights. If a 1B infringer were to create a genetically identical clone from a donor mammal using the disclosed cloning method, and the clone were to differ in certain phenotypic characteristics, Roslin would undoubtedly dispute any defense of non-infringement based on phenotypic differences. Assuming you had a patent and someone created a genetically identical clone, as the government says, and they asserted non-infringement based purely on phenotypic differences, would you concede non-infringement? Phenotypic differences from what? As compared to the parent or compared to the clone? I assume clone to clone. Clone to clone. I think that, I guess the question becomes, with respect to infringement, is does it fall within the claim? Is it a clone of? Phenotypic, notwithstanding. Well, I think that there will always be phenotypic differences between a clone. And they're not claimed, right? The phenotypic differences are not a claim. I think it's an inherent part of it being a clone. I think that if you think about animals and their generation, phenotypically, and we've put in evidence to this extent, that, for example, identical twins is perhaps a nice example. The irises of identical twins are different because of phenotypic differences. The irises will always be different. Their fingerprints will always be different. Again, these are phenotypic processes that occur during development that are always going to be there. And what you're saying is, despite those differences, any cloned animal infringes regardless of the phenotypic differences, right? I think, again, if it falls within the language of the claim, yes. You put so much emphasis on phenotypic differences in your argument for patentability. Well, I think we're talking about one thing. One thing we're talking about is whether or not it falls within or outside of 101. The other question is infringement, yes. Infringement is a totally different question. I think it doesn't need to be handled under 101. But in terms of anticipation and obviousness, how can you distinguish your cloned animals from the prior art based on phenotypic differences, which aren't specified in the claims? Well, again, I think there are a number of differences that come out of the claims, leaving phenotypic differences aside. There's the fact that the claims require two animals. You're giving up on the phenotypic differences? No, I think that, again, the phenotypic differences have been recognized. There are phenotypic differences. They're always going to be there. Well, how can the phenotypic differences prevent you from being anticipated or rendered obvious by prior art? Okay, if we just look at the phenotypic differences just by themselves, what does anticipation require? Anticipation requires something that's exactly the same. I think that there's good case law on that. When you have differences, no matter what those differences are, the question is, are those differences obvious differences? Well, each sheep has different phenotypic differences, right? Well, again, it depends on the claim. I think you have to look at it on a claim-by-claim basis and not on an animal-by-animal basis. How do you claim one sheep versus another sheep? Perhaps you could deposit... But the prior disclosures didn't say anything about phenotypic differences, right? No, the prior disclosures did not. And your claims don't say anything about them. So I'm just puzzled, as I think Judge Wallach is also, as to how you can distinguish your animals from the prior art animals based on differences which weren't disclosed in the prior art and which aren't claimed in your claims. Well, I think that the differences are in the claim. Again, I think that it's an inherent process, an inherent part of what the claim says. The claim requires two animals. There has to be a donor animal and there has to be a clone. Now, what is a clone? A clone is a time-delayed copy of the prior animal. That situation, a clone and a parental animal that's genetically as close as you can get with phenotypic differences as well as this time delay, which is really what the invention is all about, time delay. It's not about the phenotypic differences. This situation doesn't exist either in nature or in the prior art animals. You don't have a parent and a clone, one older than the other, both of them genetically identical. And you could repeat this. You could have three animals. But the time delay in and of itself is inherent in Darwin. That's the whole point of evolution. It's a combination of those two things, Your Honor. It's a combination of a time delay. Certainly, every child is younger than its parent, but every child is different, much different than their parents, as I'm sure all of you are well aware. So, all of a sudden, you have the next generation having the same genetic component as the prior generation. Maybe I should have said the theory of relativity. Perhaps. That situation is never set up either in nature or in the prior art. Now, in the prior art, the closest thing, again, I think that you can imagine is identical twins. But those don't have that time difference. They have phenotypic differences from each other, but they don't have the time difference. So, once those two identical twins are gone, their genetic information is gone forever. So, twins are fertilized in a fertilization clinic, and one is brought to term and the other is kept frozen. And then later fertilized and brought to birth. What's the difference? What's the difference between that and a clone? You have your two identical animals at two different times. Well, I think that you would have to actually, that's something that hasn't been done yet. You'd have to start with two embryos that are identical with each other. It's not simply do in vitro fertilization and start with a single embryo. You'd actually have to split those embryos. Or they split naturally. But, again, that's not something that had been done previously. I think that that's something that hasn't been done today. The ability to actually split an embryo and do that kind of thing and freeze it and bring it back after time. Again, I think that that's not something that's being used against us, either as prior art or something that occurs in nature. Are you familiar with Strimcore's decision in Sears, Roebuck, and Stipple, the lambs? Well, what the case says, as I understand it, is that it can't be an infringement to copy something which is itself not patented, not protected by patent. So, under that case, how can it be an infringement for somebody to copy a sheep that's living in a barnyard? The original sheep isn't protected by a patent. No, the original sheep is not. Using a particular method. Yes. And you have method patents, and they're not an issue today. But how can the making of a copy, unless it's by a particular method, be an infringement? Well, again, they would infringe the method patents, I think, regardless of what happens. So, I guess the question comes down to... It's certainly a question that I haven't thought about in terms of infringement, again, but I don't think that infringement is in front of the court here today. I think the question is whether or not we're talking about patent in subject matter, or anticipation, or obvious. Well, we're talking about whether you can have a valid patent, which can be used to prevent somebody from copying something which isn't patent protected, using an unpatented method. Assume you've licensed the person to use your method, but you're asserting an infringement on the product. Right. I think certainly product claims have different proofs, in terms of what needs to be proved. And I think that's one of the benefits of having composition claims as opposed to method claims. It doesn't matter how it was made, once you have a composition claim. And I think that's the important piece of this for our clients. They like to have the composition claims. I think that in terms of copying something, why or why not something would be an infringement, I think that it depends on whether the copy is identical to or not identical to what you start with. I think in this case, the copy, when we're talking about animals, and I think animals is different, mammals particularly, is different than plants. Plants make copies of themselves, naturally, that are genetically identical. I think all of us have probably at one time seen that you can cut off a branch from a tree or a bush, put it into water, it sprouts roots, and you've got another plant, identical genetically to the parent. This is not something that happens naturally with respect to animals. Which is why the method is patentable. The question is whether the copy is patentable. Yes. And I think that the question to us seems to be, what is the reason why it shouldn't be patentable? Under what exception does it fall? Is it a natural phenomenon? Is Dolly made by nature, or is Dolly made by man? Is Dolly a copy of something made by nature? Dolly is a copy, but it's not a perfect copy. It's not exactly nature. It is different than nature. But they're not copying your copy, right? They could be making a copy of Dolly's parent. Would it be exactly the same? I mean, you could make lots of Dollys, yes. They wouldn't be identical to each other. You're saying that any time anybody makes a cloned copy of a farm animal, it's infringing your patent, right? Yes. Well, a pre-existing one, yes. But your own argument—do you not see the circular nature of your argument? Your own argument was that the reason that this is patentably distinct and entitled to patentability is by virtue of phenotypic differences that exist, because no two could be the same. But then you're saying if someone else came along and cloned, either the clone or the parent, it would nonetheless infringe, despite the fact that it would have the exact same types of phenotypic differences that you claim distinguish you. Well, it would have the time delay, which is the important phenotypic difference, I think. I don't understand that argument. It makes no sense whatsoever to me. I actually would love to have you tell me why your case, as argued, is not frivolous in light of Myriad and the other Supreme Court precedent, which is clearly—why didn't you just dismiss this? Why didn't you pull it? Why are you here today? Again, I think that there is no reason under the current statute as to why it's not a patentable. No reason? Did you read Myriad? Yes, I read Myriad. Okay, so how is Dolly and your clone like cDNA, which is the only thing that they said was still okay? What is a cDNA? It is a copy of a naturally occurring cDNA. Actually, no, it's the opposite of a copy of a naturally occurring, right? It has the base pairs directly opposite, right? Maybe somebody will explain this technology. Well, there's RNA and there's DNA. It's a copy of the RNA. Ribonucleic acid. So you make a DNA copy, deoxynucleic acid, copy of the ribonucleic acid. The only difference is ribonucleic acid versus deoxynucleic acid. Yes, but which isn't in nature, found. Is it found in nature? No. So the only thing they said was still patentable, the cDNA, was something that was manufactured by man and not found in nature. And here you have, I mean. Our claims do not cover nature. Our claims do not cover Dolly's mother. But your claims cover the exact same thing that's found in nature, right? No, it does not cover something. Genetically identical thing, and that was the line the Supreme Court clearly drew in Myriad. And your argument is? Well, it's the same thing at a different time. And that's the only distinction. I think that is the important distinction. I think that that is the invention. The invention is the ability to have the same thing at a later time. But the Supreme Court made it clear in Myriad genetic identicality is off the table. The only reason, and they were very clear, that the cDNA was allowed is it wasn't genetically identical. And you've admitted that these two clones are genetically identical. So I don't see how you still are saying. I think you have to look at what the difference is as well between what happens with DNAs naturally. DNAs make copies of themselves every day inside your body. Your body is making copies of DNA. So that's a very natural process to make a copy of the DNA. To make a copy of an organism. Well, but you're talking about the process. Nobody here is arguing your process claims are not directed to patentable subject matter. Well, it seems to me that the end product, the clone itself, which exists. So when I manufactured DNA that is genetically identical to the other DNA, kind of sounds like Myriad to me. The DNA itself has been by the Supreme Court deemed to not be patentable subject matter. The DNA itself. Correct. Yes. And that's what you're trying to claim here. No, we're not trying to claim, for example, going out into the wild. Finding a cow and putting it into a barn. To me, that would be Myriad. Isolating a cow in a barn. I hate to come full circle on this, but you would agree with Einstein that time is a natural phenomenon, right? Yes. Thank you. All right. Thank you, Mr. Origo. We'll give you two minutes for rebuttal. Ms. Nelson. Thank you. Just a second. May it please the Court. Ruslan has a problem with their claims under both eligibility and under prior art. And this Court can affirm on either ground. As he has just discussed the eligibility, I'll start with that. And there are several problems with his eligibility argument. First off, the problem with Ruslan's clones is that they are not new. They are copies. So under the statute, under 101, they do not meet the statutory requirement of being new. Second, they fall into the judicial exception for natural phenomenon because they are not markedly different from naturally occurring mammals. And thirdly, the claim is so broadly drafted that it covers basically anything that is cloned from a non-embryonic donor mammal, any kind of mammal within sheep, pigs, goats, and cows. And as such, it causes a great preemption problem, which the Court in Mayo, Dempson, and also in Moores has guarded against. So their argument about phenotype is problematic for exactly the reasons that you have indicated, Judge Moore and Judge Wallach. First, the infringement issue, they take a different stance in infringement than they would in their argument as to why their claims are eligible. And secondly, a copy is problematic because it's copying something that's naturally occurring and the naturally occurring molecule itself is not patentable. And as in Myriad, the genomic DNA, in the process of isolation, you are copying the DNA, and yet the Court in Myriad is not going to grant a patent. The Court in Myriad is quite clear about what we're going to do with this case. But here's my question to you. What, explain to me, I don't understand, phenotypic differences, aren't these just environmental? I mean, since they're not genetic, I don't even technically really understand them. I mean, they're just environmental. Like, let me give you an example. Suppose I wanted to reproduce, you know, a plant or something. I mean, I don't know. I take the same genetic material, and then it's just a matter of the environment in which it's grown in, right? The hospitability of the uterus in which it's placed, or, you know, is it all stuff that's affected by how the environment is treating it? Is that what dictates all of these phenotypic, whatever they are, differences? I mean, that's exactly it. The phenotype is dictated by the environment, by developmental cues, and that is... But it isn't by anything. When you're making a clone and you're using the same genes and you're making it, it isn't something... It's not affected by the method of cloning. The cloning method, and that's exactly it. It's not, it's nature's handiwork. It's not man's handiwork. The cloning process causes the creation of something that's genetically identical. Any phenotypic differences, which typically, you know, could be very, very slight and not even a marked difference. What about this? What about a situation where they have realized, not just cloning an animal, but they actually realized, and if you culture the clone in a certain environment, it will consistently produce certain characteristics? Do you follow me? Would that animal then be patentable subject matter because you have now not only copied the exact DNA, but then manufactured an environment in which to raise it such that it has predefined characteristics of your choosing? Would that matter? So you're saying it's almost an artifact of the process? It's kind of like instead of genetically engineering it to have blue eyes, they realize if it is put into a certain kind of environment in the culturing, it is going to have blue eyes every time. So it's kind of like genetic engineering, sort of, except it isn't the genetic part that causes the manifestation of the physical characteristic, but rather the environment. Does that make any sense? Yes, it does. I think that could potentially be a different case. They'd have to claim the blue-eyed animal, wouldn't they? Right. They'd have to claim the blue-eyed animal. Right, they'd have to claim it, or at least disclose whatever process they're going through. Would the animal be patentable, or would the method of doing it be patentable? I don't know whether it would be patentable, but it might be patent-eligible if they actually show that because of humans' ingenuity, they were able to come up with something that's markedly different from what occurs in nature. Well, but then would it really be markedly different? Like some of these sheep, by virtue of the cloning process, might end up with blue eyes randomly, blind squirrel finds a nut once in a while kind of thing, and so maybe they are found in nature, not consistently every time, but so, I don't know, if it represents itself in nature once or twice or three times, is that enough to then prevent its later patentability when you figure out how to make it manifest every time? I'm not sure that it, I mean, with the red psycho, I thought you were talking about having a very different characteristic. I think if it's just a matter of having a repeatable process, that might give you, again, a process claim, but in terms of the actual product, again, you'd face the same problem as it actually occurs in nature. And, you know, again, with their claims, they're so broad, they do cover any kind of, you know, phenotypic differences, a large variety of phenotypic differences, and so that the claim, the class of cloned mammals do not differ phenotypically from non-cloned mammals, and a person of ordinary skill would not be able to distinguish a cloned mammal from a non-cloned, from a naturally occurring mammal. My clerks and I were kicking around. If you cloned, if you took two clones and put them in the same uterus, so that they were treated as identical twins, they would develop different, they'd have the same exact environment, developmental environment, but they'd develop different irises, for example, iris patterns, and the standard phenotypes that distinguish animals, would they not? They quite possibly could have differences, but that, again, could be because there would be some slight differences in the environment and the environmental cues that they're subjected to. If the environments are exactly the same? One of them's kicking the other one. One of them's in there kicking the other one. It comes out a little different. I mean, that does happen genetically with twins, that one will have a slightly different environment in the womb and develop a little bit differently. I'd be happy to address the prior art rejections if you have any questions. Otherwise, I will see if there are any. Just one question. So in these prior art animals, they'd have the same kind of random phenotypical differences that the claimed animals have, right? Yeah, and that's exactly the point we make. Regardless of whether you start with a mammal that's at the embryonic stage or at the non-embryonic stage, if you, you know, assume you start with the same cell, you could start with it at the embryonic or at the non-embryonic and end up with the same animal. And that broad class that we're talking about would show the same kind of phenotypic variation. All right. Thank you, Ms. Nelson. Mr. Riegel, you have two minutes. Thank you, Your Honors. The only last point that I'd like to touch on is what does myriad really stand for? And I think my reading of myriad is that myriad sets up a difference between creation and discovery. The things that are simply discovered are not something that's patentable. However, creation is something that is patentable. I think Dolly is a creation. A clone of an animal, a preexisting animal, is a creation, something that does not ever exist in nature prior to this discovery. But doesn't myriad necessarily stand for the proposition that if you copy DNA that exists in nature, it's not patentable? I think it depends on the situation that you put that into. I think that if you copied exactly the DNA that's in nature and you put it into a plasmid vector, that would be patentable. Because you have taken it and put it into a new context. You've changed it somewhat, a little bit, or at least put it into something different. The actual DNA has not been changed at all. It's simply a copy and it's exactly what exists in nature. And nature makes copies. But if you wrote the claim to the copy of the DNA exclusively, that wouldn't be patentable, right? I think that the problem there is how do you distinguish? There is no difference between a copy of the DNA and the DNA. And so the copy is not patentable. Right. However, a copy of an animal, a copy of a living thing, has both these phenotypic differences, which are going to be there no matter what you do. And I think really more importantly is this fourth dimension, which is a little hard to talk about in terms of patent law. But something exists at a delayed time. With animals, that's a very different concept. It's not applicable across a lot of other non-living compositions. Well, I guess that delayed time could be true in myriad, too, where you copied DNA. The second DNA would have come into existence at a later time, no? Yes, but that happens naturally as well. Nature makes copies of DNA that exist at later times. It's not something that can be used to discriminate with respect to DNAs. Okay. Thank you very much. Thank you, Mr. Rego. Thank both counsel. The case is submitted. And that concludes the hearing.